**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE**

| | | |
|---|---|---|
| **PIONEER CHRISTIAN ACADEMY,** | ) | |
| | ) | |
| **Plaintiff/Counter-Defendant,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:12-cv-00610** |
| | ) | |
| **THE CINCINNATI INSURANCE** | ) | **JURY DEMAND** |
| **CO.,** | ) | |
| | ) | |
| **Defendant/Counter-Plaintiff.** | ) | |

## DEFENDANT/COUNTER-PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant/Counter-Plaintiff, The Cincinnati Insurance Co. ("Cincinnati"), by and through undersigned counsel, submits this Memorandum of Law in support of its Motion for Summary Judgment against Plaintiff, Pioneer Christian Academy ("Pioneer").

## PROCEDURAL POSTURE OF CASE

Pioneer filed the instant action on June 13, 2012, seeking recovery for alleged lost Business Income and/or Rental Value because of water damage at its property. (Doc. 1). Pioneer sought additional recovery for alleged bad faith, violation of the Tennessee Consumer Protection Act, Negligence, and Unjust Enrichment. Id. On August 1, 2012, Cincinnati filed its Answer and Counter-Claim, seeking a declaration that Pioneer's alleged Business Income and/or Rental Value ("Business Income") claim was not covered by the policy. (Doc. 6). Cincinnati sought recovery of $615,074.99 paid to Pioneer without knowledge that the property was vacant, limiting Cincinnati's liability to Pioneer under the policy. Id. Cincinnati also sought a penalty for Pioneer bringing the action in bad faith pursuant to T.C.A. §56-7-106, based upon Pioneer's false representation made in

support of its Business Income claim of $236,832.00 that Family Christian Academy ("FCA") would have leased the property when it knew FCA's position was that it would not have rented the property. Id.

## STATEMENT OF FACTS

Pioneer Christian Academy owned property located at 4479 Jackson Road, Whites Creek, Tennessee, 37189. (SUMF 1). During portions of 2009 and 2010, the property was utilized as a school and leased to Nashville Global Academy, a charter school. (SUMF 2). In either May or June of 2010, Nashville Global Academy, vacated the premises. (SUMF 3). After its tenant vacated the premises, Pioneer attempted, without success, to find a suitable tenant for the property. (SUMF 4).

On or about August 6, 2010, a water supply line at the property failed resulting in water damage to the property. (SUMF 5). Cincinnati paid for damages to the property caused by the water damage. (SUMF 6). As of the date of the water loss, there was no written agreement between Pioneer and any other entity to lease the property. (SUMF 7). During the time Nashville Global Academy vacated the premises and the August 6, 2010 water loss, Pioneer discussed with the property's availability with entities including Davidson Academy, YWAM, Salvation Army, Smith's Head and Craig,[1] Youth for Christ, Vol State and the Salvation Army. (SUMF 8). However, no agreement was reached with any of these organizations to lease the property. (SUMF 9). Pioneer submitted no proof to Cincinnati that any of these entities would have leased the Pioneer property but for the water loss. (SUMF 14).

On or about March 11, 2011, Pioneer formally notified Cincinnati of its intention to seek a claim under the Business Income coverage. (SUMF10). The policy issued by

---

[1] Possibly Smithson-Craighead Academy.

Cincinnati contained the following Insuring Agreement for the Business Income Coverage:

1. **Business Income**

   a. We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical "loss" to property at a "premises" which is described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The "loss" must be caused by or result from a Covered Cause of Loss. With respect to "loss" to personal property in the open or personal property in a vehicle, the "premises" include the area within 1,000 feet of the site at which the "premises" are located.

The term "Business Income" is defined as follows:

   b. Business Income means the:

      (1) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

      (2) Continuing normal operating expenses incurred, including payroll.

(SUMF 11). In support of its claim for Business Income loss, Pioneer supplied monthly profit and loss statements, a Business Interruption evaluation prepared by Rollins Accounting & Inventory Services, Inc., a prior lease agreement, and an affidavit from Belinda Scarlata, an administrator for FCA. (SUMF 12). Pioneer claimed $236,832.00 in lost rents or business income.[2] (SUMF 13).

Upon receipt of Pioneer's Business Income claim and supporting documents, including the affidavit of Belinda Scarlata of FCA, Cincinnati requested assistance from counsel to investigate Scarlata's affidavit and any other facts surrounding whether FCA

---

[2] Cincinnati paid $36,114.34 towards Pioneer's unforeseen extra expenses.

would have leased the property but for the water damage. (SUMF 14)[3]. According to this investigation, FCA was at one time interested in the property. (SUMF 15). However, Scarlata testified there was never any agreement between FCA and Pioneer to lease the Pioneer property. (SUMF 16). Cincinnati's counsel also took the Examination Under Oath (EUO) of Pioneer's Head of Board, Reverend Samuel Gage, on April 20, 2011. (SUMF 17).

Cincinnati determined there was no agreement between Pioneer Christian Academy and FCA sufficient to support Pioneer's Business Income claim. (SUMF 18). Cincinnati denied Pioneer's Business Income claim on this basis and also because the policy did not contain Rental Value as an option included in the Business Income Coverage. (SUMF 19). Cincinnati later learned of an error with respect to whether Rental Value was to be included on the policy and rescinded the lack of Rental Value coverage as one of the basis of the denial. (SUMF 20).

Pioneer provided no other documentation to support an agreement with FCA other than the affidavit. Other than the Scarlata affidavit and testimony from Pioneer representatives, Pioneer provided no other evidence or documentation to Cincinnati to demonstrate FCA would have leased the property but for the water loss. (SUMF 21 and 32).

Pioneer's Business Income claim is based upon its contention it had a tenant in FCA, other interested parties such as Drexel Preparatory Academy, or rents it was entitled to collect from Nashville Global Academy. (SUMF 30). While Pioneer contends it had an agreement with FCA, it does not know specifically price was agreed. (SUMF

---

[3] Several of the referenced undisputed facts paraphrase the testimony of witnesses. The full extent of such testimony is included elsewhere in this brief, in Cincinnati's Statement of Undisputed Facts, or in the selected excerpts of testimony which have been filed.

31).  Pioneer never provided proof establishing what price of lease was included in any alleged agreement between Pioneer and FCA.  (SUMF 33).  Pioneer's Head of Board, Rev. Samuel Gage, never discussed lease prices with any other entities while Nashville Global was still in the property, and did not know how far Pioneer was in the process with either Davidson Academy or Vol State.  (SUMF 34).

Davidson Academy did not have the means to rent the property as it had been unable to sell its campus.  (SUMF 35).  Nothing ever came of any interest by the Salvation Army.  (SUMF 36).  The other entity Pioneer claims had an interest in the property was Drexel Preparatory Academy ("Drexel"), which currently leases the Pioneer property, and began leasing it in March 2011.  (SUMF 37).  However, Pioneer did not previously consider Drexel acceptable because of its "lowball" offers which were not acceptable.  (SUMF 38 and 39).

Nashville Global Academy abandoned Pioneer's property and stopped paying rent because it ceased to be a school when its charter was terminated.  (SUMF 40).  Pioneer never went after Nashville Global Academy for rent under the pre-existing lease because "there was really nothing worth pursuing."  (SUMF 42).

## LAW AND ARGUMENT

Cincinnati should be granted summary judgment because Pioneer sustained no "actual loss" of rents or income necessary to establish a business income claim as alleged in Plaintiff's complaint.  As discussed below, Cincinnati is not liable on the policy for such claims, and Pioneer's claims for bad faith, Tennessee Consumer Protection Act, Unjust Enrichment, and Negligence should also be dismissed, with prejudice.

## I. SUMMARY JUDGMENT STANDARD

A moving party is entitled to a grant of its motion for summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c). The burden is initially upon the moving party to show that there does not remain in dispute any genuine issue of material fact. General Motors Corp. v. Lanard Toys Inc., 468 F.3d 405, 412 (6th Cir. 2006). The moving party may satisfy this burden by pointing out to the Court that there is no evidence underlying the non-moving party's case. Id. Once the moving party supports its motion for summary judgment, the opposing party must go beyond the contents of its pleadings to set forth specific facts indicating the existence of a genuine issue to be litigated. Fed. R. Civ. Pro. 56(e); see Natl. Solid Wastes Mgmt. Ass'n v. Voinovich, 959 F.2d 590, 592 (6th Cir.1992). The proper inquiry is whether the state of the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Stromback v. New Line Cinema, 384 F.3d 283, 292 (6th Cir. 2004). According to the Sixth Circuit, "when a defendant files a motion for summary judgment, the plaintiff is challenged to 'put up or shut up' on a critical issue, Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir.1989), and is not entitled to a trial solely on the basis of his allegations. Rollen v. Horton, CIV. 3:08-0227, 2009 WL 1346119 (M.D. Tenn. May 11, 2009) (citing Gregg v. Allen–Bradley Co., 801 F.2d 859, 861 (6th Cir.1986)).

## II. TENNESSEE LAW CONTROLS SUBSTANTIVE ISSUES

In diversity actions, state law controls the parties' substantive claims and defenses. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The district court must apply the conflict of law rules of the forum state when determining which state's laws govern a diversity action. Johnson v. Ventra Group, Inc., 191 F.3d 732, 738 (6th Cir.1999). This suit was filed in a federal district court in Tennessee, and the conflict law of Tennessee will determine what substantive law governs this dispute. Id.

According to Tennessee statute:

> Every policy of insurance, issued to or for the benefit of any citizen or resident of this state on or after July 1, 1907, by any insurance company or association doing business in this state, except fraternal beneficiary associations and mutual insurance companies or associations operating on the assessment plan, or policies of industrial insurance, shall contain the entire contract of insurance between the parties to the contract, and every contract so issued shall be held as made in this state and construed solely according to the laws of this state.

Tenn. Code Ann. § 56-7-102. Here, the policy was issued to a Tennessee non-profit corporation, Pioneer, by Cincinnati, an insurance company doing business in Tennessee. Thus, Tennessee law controls the parties' substantive claims and defenses.

## III. PIONEER'S CLAIM IS NOT COVERED UNDER THE POLICY.

Pioneer seeks coverage for alleged loss of business income resulting from water damage at its vacant property.[4] As an insured, Pioneer has the burden of proof to demonstrate that a covered loss has occurred within the terms of the policy. Provident

---

[4] In its answer to Plaintiff's complaint, Cincinnati argued the property was vacant for 60 or more days at the time of loss. Cincinnati is no longer taking the position that the property was vacant for 60 days, but there is no dispute that the property was actually vacant for some period of time when the loss was discovered.

Life & Acc. Ins. Co. v. Prieto, 169 Tenn. 124, 83 S.W.2d 251 (1935), Massachusetts Mut. Life Ins. Co. v. Jefferson, 104 S.W.3d 13, 22 (Tenn. Ct. App. 2002); Farmers Bank & Trust Co. of Winchester v. Transamerica Ins. Co., 674 F.2d 548, 550 (6th Cir.), cert. denied, 459 U.S. 943, 103 S.Ct. 257, 74 L.Ed.2d 200 (1982).  Indeed, as the insurer, Cincinnati has absolutely nothing to prove – and absolutely no burden – until Pioneer proves by a preponderance of the evidence that the loss comes within the terms of the policy.  See Farmers, at 550.

Here, the policy at issue included a Business Income Coverage Form.  Like any other contract, the Tennessee courts interpret the language of a business income coverage provision per its plain, ordinary, and popular sense.  Gates v. State Auto. Mut. Ins. Co., 196 S.W.3d 761, 764-65 (Tenn. Ct. App. 2005).  The language of an insurance policy, "…sets the outer limits of an insurer's contractual liability.  If coverage cannot be found in the insuring agreement, it will not be found elsewhere in the policy."  Standard Fire Ins. Co. v. Chester O'Donley & Associates, Inc., 972 S.W.2d 1, 7-8 (Tenn. Ct. App. 1998).  Here, the Business Income Coverage Form specifically provides as follows:

**1.    Business Income**

a.     We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration".  The "suspension" must be caused by direct physical "loss" to property at a "premises" which is described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations.  The "loss" must be caused by or result from a Covered Cause of Loss.  With respect to "loss" to personal property in the open or personal property in a vehicle, the "premises" include the area within 1,000 feet of the site at which the "premises" are located.

The term "Business Income" is defined as follows:

b.     Business Income means the:

**(3)** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

**(4)** Continuing normal operating expenses incurred, including payroll.

There is limited Tennessee case law interpreting similar Business Income insurance provisions. Gates, at 765, Artist Bldg. Partners v. Auto-Owners Mut. Ins. Co., 2013 WL 6169337, n. 4 (Tenn. Ct. App. Nov. 21, 2013). Generally, however, Tennessee courts hold:

> The purpose of business interruption insurance is to protect the insured against losses that occur when its operations are unexpectedly interrupted, and to place it in the position it would have occupied if the interruption had not occurred. A related rule is that a policy of this type may not be used to place the insured in a better position than it would have occupied in the absence of the catastrophe.

Id. (quoting Cont'l Ins. Co. v. DNE Corp., 834 S.W.2d 930, 934 (Tenn. 1992)) (emphasis added). Thus, business interruption insurance was created to put an insured back to the position he would have been but for the loss.[5]

Other jurisdictions interpreting similar business income provisions hold an insured seeking to recover thereunder must prove it sustained property damage as a result of a covered loss, there was an interruption of its business as a result of the property damage, there was an actual loss of business income during the time necessary to restore the business, and this loss of income was caused by the interruption of the business and not by some other factor or factors. Dictiomatic, Inc. v. U.S. Fid. & Guar. Co., 958 F. Supp. 594, 602 (S.D. Fla. 1997) (citing Cont'l Ins. Co. v. DNE Corp., 834 S.W.2d 930 (Tenn. 1992); Ramada Inn Ramogreen, Inc. v. Travelers Indemnity Co., 835 F.2d 812 (11th Cir.1988); Supermarkets Operating Company v.

---

[5] The coverage is to place an insured in the position it "would" have been in but for the loss – not a position it "could" have been or "might" have been.

Arkwright Mutual Ins. Co., 257 F.Supp. 273, 277 (E.Dist.Penn.1966); Manduca Datsun, Inc. v. Universal Underwriters Ins. Co., 106 Idaho 163, 676 P.2d 1274 (Ct. of Appeal 1984); Berkeley Inn, Inc. v. Centennial Ins. Co., 282 Pa.Super. 207, 422 A.2d 1078 (1980).[6]

In the instant case, it is undisputed Pioneer's property was damaged by a covered loss, that is the water damage. Indeed, this water damage would have prohibited Pioneer from renting the property to a third party for some period of time if there was a tenant that would have leased the property had there been no loss. Thus, the issue is whether Pioneer has proven any suspension of operations caused an "actual" loss of business income caused solely by the water damage and not other factors. In other words, Pioneer must prove that had there been no water loss, FCA (or some other tenant) would have occupied the property and paid rent, but instead because this water loss occurred, FCA could not occupy the property as agreed, and Pioneer was instead unable to collect rent resulting in a loss of Business Income.

Importantly, speculation regarding what contracts (such as a lease) an insured would have procured absent the loss or how much income those contracts would have generated is inadequate to meet this burden. Am. States Ins. Co. v. Creative Walking, Inc., 16 F. Supp. 2d 1062, 1066 (E.D. Mo. 1998); see also Nat'l Union Fire Ins. Co. v. Scandia of Hialeah, Inc., 414 So. 2d 533, 534 (Fla. Dist. Ct. App. 1982) (stating business interruption loss may not be based on speculation). Rather, the insured must provide proof of actual facts which demonstrate with reasonable certainty an estimate of

---

[6] See also Royal Indemnity Co. v. Little Joe's Catfish Inn, Inc., 636 S.W.2d 530 (Texas Ct. of App.1982); Northwestern States Portland Cement Co. v. Hartford Fire Ins. Co., 360 F.2d 531 (8th Cir.1966); Great Northern Oil Co. v. St. Paul Fire & Marine Ins. Co., 303 Minn. 267, 227 N.W.2d 789 (1975)).

damages. <u>Maher v. Cont'l Cas. Co.</u>, 76 F.3d 535, 541 (4th Cir. 1996); <u>Creative Walking, Inc.</u>, at 1066; <u>Dictiomatic, Inc.</u> at 605-06. Pioneer has failed to meet this burden.

Pioneer's Rule 30 representative, Sydney Jordan, was deposed and testified about the bases upon which Pioneer's Business Income claim was based:

> Q. Okay. What is the basis for Pioneer's assertion that it sustained a business income loss or loss of rents loss at the Pioneer property?
>
> A. Well, there's two or three, I mean we figure we had a tenant in Family Christian Academy, for one.
>
> Q. Okay. That's one.
>
> A. We have other interested parties and point of fact Drexel came along, you know, within days of that. Further, had -- you understand that any cause for damages that we had against Global or perhaps anyone associated with Global, if they were guilty of such malfeasance as would have justified it were basically extinguished for any date after the date of loss because we can't charge them rent for a building that we couldn't lease anyway.

(SUMF 30, Dep. Jordan, P. 67, Lines 11-25, P. 68, Lines 1-5). We now examine each of these bases, and as demonstrated below, Pioneer has not met its burden to show it sustained an actual loss of business income caused by the water damage to its property.

## 1. Pioneer had No Agreement to Lease the Property to Family Christian Academy.

Family Christian Academy was the organization Pioneer contends would have leased its property, but was prevented from doing so because of the water damage. Pioneer simply cannot demonstrate there was an agreement between it and FCA to lease the property that was obstructed by the water loss. Therefore, Pioneer cannot sustain a business income claim for damages arising out of its alleged relationship with FCA.

Pioneer submitted an affidavit from FCA's Belinda Scarlata to show FCA would have leased Pioneer's property but for the water damage. According to Scarlata and the affidavit, FCA did desire to lease or purchase the property. (SUMF 15 and 23). She even asked to look at a lease agreement. (SUMF 23). However, as she wrote Pioneer representatives in September 2011 (before this suit was filed), "no one ever returned my call with availability, quoted me a price, [or] showed me a lease . . ." Id. She actually inquired about the space as a "back-up" plan, and was told that rental was not likely because the Salvation Army was interested in buying the property. (SUMF 24).

Belinda Scarlata, was also deposed and confirmed that she made inquiries regarding the property during the summer of 2010 simply as "backup plan." (SUMF 25, Scarlata Dep. P. 8, lines 14-18; P. 12-13, lines 11-25 and 1-3). She explained FCA's lease agreement with its current landlord was going to end in August 2010 and FCA would require a new property if it was not able to come to a new agreement with its landlord. (SUMF 25, Dep. Scarlata Page 12-13, lines 11-25 and 1-3). In fact, on August 18, 2010, FCA was able to reach an agreement with its landlord to renew its lease and, as a result, FCA did not pursue a lease agreement with Pioneer. (SUMF 26, Dep. Scarlata Page 20, lines 3-25; Page 30, lines 4-11). Based on this testimony, Pioneer cannot prove it would have procured a contract with FCA "but for" the water loss, and thus, its business income claim fails. Indeed, Ms. Scarlata specifically testified that her decision not to rent the property was not affected by the water damage and, in fact, she had no knowledge of the water damage at the time she made this decision. (SUMF 27, Dep. Scarlata Page 65, lines 6-19).

Admittedly, there is conflicting testimony amongst the witnesses regarding discussions between Pioneer and FCA at this time. Specifically, Ms. Scarlata and Pioneer's own Head of Board, Samuel Gage, both testified that no agreement was reached regarding the length or price of the potential lease. (SUMF 28 and 29, Dep. Scarlata P. 18-19, lines 17-25 and 1-3; P. 19, lines 9-12; EUO Gage Page 49, lines 8-16). Comparatively, Sydney Jordan, individually and in his capacity as Pioneer's Rule 30(b)(6) witness, testified an agreement was reached regarding the term of the lease and price. (SUMF 31, Dep. Jordan P. 110, lines 2-19). He further asserts that FCA would have been a tenant of Pioneer if the water loss had not occurred. (SUMF 32, Dep. Jordan P. 124, lines 17-19). In fact, this testimony supports Cincinnati's position that there was no agreement between Pioneer and FCA to lease the property as there clearly was no proof demonstrating a meeting of the minds between these parties' respective representatives. (SUMF 33, Dep. Jordan Page 114-115, 17-25 and 1-19).

Leases are forms of contracts, and contracts "must result from a meeting of the minds of the parties in mutual assent to the terms, must be based upon a sufficient consideration, free from fraud or undue influence, not against public policy and sufficiently definite to be enforced." <u>Doe v. HCA Health Servs. of Tenn., Inc.</u>, 46 S.W.3d 191, 196 (Tenn.2001). "Broadly speaking, preliminary negotiations as to terms of an agreement do not constitute a contract, although this does not preclude the formation of a binding contract during the negotiations." 17 Am.Jur.2d <u>Contracts</u> § 25 (1964). In this regard, "[i]t is well settled that a binding contract may be entered into through the medium of correspondence by letter or telegraph." <u>Gurley v. King</u>, 183 S.W.3d 30, 42-43 (Tenn. Ct. App. 2005)(citing <u>Neilson & Kittle Canning Co. v. F.G.Lowe & Co.</u>, 149

Tenn. 561, 564, 260 S.W. 142 (1924)).  The "essential inquiry" is whether the "agreement satisfies the requirements of mutuality, clarity and definiteness in the basic elements of date, parties, a valid agreement to sell, and a description of what was agreed to be sold.  Parsons v. Hall, 184 Tenn. 363, 366, 199 S.W.2d 99, 100 (1947).

Importantly, while Mr. Jordan testified an agreement was reached between Pioneer and FCA regarding the lease price, he could not specifically state what the amount of the agreement was:

Q:     What was the price they were going to pay?

A:     I don't remember the number, it would have been—it would have been a little bit---I think $1,000 less than what's their name was paying, Global.

(SUMF 31, Dep. Jordan p. 110, lines 2-6).  Indeed, Pioneer has no presented no proof clearly establishing what price, if any, was agreed on by Pioneer and FCA.  (SUMF 33, Dep. Jordan P. 114-15, lines 17-25 and 1-19).  Thus, even if Mr. Jordan's testimony established that Pioneer had procured a lease agreement with FCA, Pioneer has failed in its burden to establish with proof of actual facts how much income that agreement would have generated and thereby how much income was lost as a result of the agreement not being fulfilled – an essential part of Pioneer's claim.  Rather, Pioneer's claim is merely speculative.

The proof provided by Pioneer fails to establish a "meeting of the minds" necessary to form an agreement by FCA to lease the Pioneer property.  There is simply no evidence that a fact-finder could consider demonstrating it was more likely that an agreement existed than not when the two parties to the alleged agreement disagree whether an agreement to lease the property existed.

If there was an actual written lease agreement between Pioneer and FCA, proof would exist concerning Pioneer's Business Income claim. However, based upon the testimony of Jordan and Scarlata, there was at best proof of an "interest" in the property. Otherwise, the evidence at to whether there was an agreement between Pioneer and FCA is a "he said-she said," and that is simply insufficient for Pioneer to meet its burden of demonstrating an agreement existed. Thus, there is no coverage for any claim of loss of business income made by Pioneer based on its alleged agreement with FCA. Accordingly, Cincinnati should be granted summary judgment as a matter of law.

**2.      Others' Alleged "Interest" in Renting the Property is Insufficient to Demonstrate an "Actual Loss."**

Pioneer's claim for loss of business income similarly fails to the extent it is based on the purported "interest" of other parties to rent the property. Such evidence constitutes pure speculation regarding what contracts Pioneer would have procured absent the loss. Moreover, this evidence fails to provide proof of actual facts concerning the amount of income purportedly lost – necessary to prove any claim for lost Business Income.

Pioneer contends it contacted multiple entities regarding renting the property after Nashville Global left. Reverend Gage testified these entities included Davidson Academy, YWAM, Salvation Army, Smith's Head and Craig, Youth for Christ, Vol State and the Salvation Army. (SUMF 8, EUO Gage P. 26, lines 18-24; P. 34, lines 14-21; P. 35, lines 1-4). There is no proof an agreement was reached with any of these parties

during this time.  Indeed, when asked whether he had even discussed price or terms of a lease agreement with any of these entities, Reverend Gage testified:

> Q: Did you ever discuss price or terms of the lease agreement with any of those entities?
> A: Not while Global was in there.
> Q: Okay.
> A: But – I don't know if we got that far with Davidson or not, or with Vol State.  Those are the two that –

 (SUMF 34, EUO Gage, P. 34, lines 23-25, and P. 35, lines 1-4).  Thus, evidence of these parties' purported interest constitutes mere speculation as to what lease Pioneer would have procured if the water damage had not occurred.  Moreover, this evidence provides no insight into what specific income was purportedly lost.

Further, the evidence demonstrates these parties lost interest in or were unable to rent the property for reasons other than the water damage.  For example, Mr. Jordan explained Davidson Academy did not have the means to rent the property as it had been unable to sell its campus.  (SUMF 35, Dep. Jordan P. 41-43).  Similarly, Mr. Jordan testified that nothing ever came of the Salvation Army's interest.  (SUMF 36, Dep. Jordan P. 43, lines 14-20).

The other entity Pioneer claims had an interest in the property was Drexel Preparatory Academy ("Drexel").  In fact, Drexel currently leases the Pioneer property, and began leasing it in March 2011.  (SUMF 37, EUO Gage, P. 63-67).  However, Jordan testified about the lack of any earlier interest of Drexel as follows:

> Q. Let me ask you about Drexel, were they prepared to lease the property in August 2010?
>
> A. They made us an offer, or made -- maybe they made -- they made a couple of written offers, they weren't acceptable, and I can't remember, maybe some were leases, some were purchases, I can't remember right now, and I don't have any of that with me.

> Q.     Okay.
>
> A.     They weren't -- we didn't consider them -- we didn't consider them acceptable.

(SUMF 38, Dep. Jordan, P. 76, lines 22-25, P. 77, lines 1-10).  He also testified about

Drexel's offer as follows:

> Q.     Okay.  I know you had a lot of things in the air, so Drexel made an offer either for sale or for lease, but it was not accepted.  Okay.
>
> A.     And it was not -- it was almost I would say a nonsensical offer I thought.
>
> Q.     Okay.
>
> A.     I means just from a standpoint of it being a lowball.

(SUMF 39, Dep. P. 77, Lines 21-25, P. 78, lines 1-4).  While Drexel was interested in

the property, it was not prepared to lease or purchase the property from Pioneer at an

amount agreeable to Pioneer.  Consequently, there was no agreement between Pioneer

and Drexel until much later, and no agreement to show Pioneer sustained an actual loss

of business income.  Proof that Drexel would have leased the property earlier but for the

water loss is speculative at best and completely insufficient to demonstrate an actual

loss of business income required by the policy.

      Pioneer cannot demonstrate it sustained an actual loss of income that would

have been earned from a lease agreement with these "interested" entities but for the

water loss.  Accordingly, Cincinnati should be granted summary judgment as a matter of

law.

3.    **Pioneer Cannot Recover Based upon Prior Lease with Nashville Global Academy.**

The only other basis Pioneer contends demonstrates or allegedly proves it sustained an actual loss of business income concerns the lease it had in place with Nashville Global Academy.  Indeed, there was a written lease agreement with Nashville Global in place that, at least according to its terms, would have provided rental income to Pioneer for some period of time after the loss.  However, Nashville Global Academy dissolved and stopped operations as a school during May or June 2010.  It did not cease occupying the property or making rent payments because of the water damage.  Instead, it abandoned the property and stopped paying rent because it ceased to be a school when its charter was terminated.  (SUMF 40, Dep. Jordan, P. 36, lines 6-9).

However, according to Pioneer, it had a right of rent payments from Nashville Global even though it abandoned the property.  Pioneer's position appears to be that even though it was unable to collect rent from Nashville Global before the loss, it could not recover rent from Nashville Global because of the water loss.  Frankly, this argument is simply without merit.

According to Sydney Jordan:

Q.     Mr. Jordan, I think you told me that you decided it wouldn't be worth the effort to go against Global for that couple of months' rent.  Are you aware that --

A.     Because we couldn't -- Global had no assets itself.

(SUMF 41, Dep. Jordan, P. 73, Lines 1-7).  Nashville Global had no assets and could not have paid the rent.  Thus, Pioneer did not seek recovery of the lease payments from Nashville Global because "there was really nothing worth pursuing."  (SUMF 42, Dep. Jordan, P. 68, lines 20-21).

Pioneer contends that it had lease with Nashville Global, and even though it abandoned the property and stopped paying rent before the water loss, the lease is one of the bases of Pioneer's contention that it sustained an actual loss of business income. However, Pioneer admits Global had no assets and was not worth pursuing. In other words, Pioneer was not going to collect rents from Nashville Global regardless of whether there was water damage. Thus, it seems unlikely, and at best speculative, that Pioneer would have ever recovered lease payments from Nashville Global. Because it was not likely to recover lease payments from Nashville Global if no loss occurred, that cannot serve as the basis of an "actual" loss of business income resulting from the water damage. Accordingly, Cincinnati should be granted summary judgment as a matter of law.

There was no actual loss of business income, and Cincinnati has no obligation to pay Pioneer for its loss of rents. Pioneer has failed to meet its burden of demonstrating by a preponderance of evidence that it sustained an "actual loss" of business income because of the water loss on August 6, 2010. For instance, had there been no water loss, Pioneer cannot tell us who would have leased the property, how much it would have received for leasing the property, or even when the lease would have started. There is no documentation from any of the entities identified concerning this required information. Therefore, Cincinnati is entitled to summary judgment as a matter of law, and Pioneer's complaint should be dismissed with prejudice.

## IV. PIONEER'S TCPA CLAIM FAILS DUE TO THE ENACTMENT OF T.C.A. § 56-8-113

In its complaint, Pioneer alleges Cincinnati is liable to it for violations of the Tennessee Consumer Protection Act ("TCPA") arising out of the denial of its loss of

business income claim.[7]  As outlined below, this claim fails because the alleged cause of action accrued after the enactment of Tenn. Code Ann. § 56-8-113.

On April 29, 2011, the Tennessee legislature enacted Tenn. Code Ann. § 56-8-113. This statute was enacted to overturn the Supreme Court's decision in <u>Myint v. Allstate Ins. Co.</u>, 970 S.W.2d 920 (Tenn. 1998) which held that an insured could seek damages against its insurer for alleged violations of the TCPA.  <u>Riad v. Erie Ins. Exch.</u>, 2013 WL 5874733, n. 3 (Tenn. Ct. App. Oct. 31, 2013) (copy attached).  Specifically, Tenn. Code Ann. §56-8-113 provides title 50 and title 56 of the Tennessee code provide the "sole exclusive statutory remedies and sanctions applicable to an insurer…for alleged breach of, or for alleged unfair or deceptive acts or practices in connection with, a contract of insurance…."  Because the TCPA is codified at title 47 of the TCPA, it is no longer available as a remedy against an insurer for causes of action accruing after April 29, 2011. <u>Riad</u>, at *10; <u>Montesi v. Nationwide Mut. Ins. Co.</u>, 2013 WL 4522905 (W.D. Tenn. Aug. 26, 2013); <u>Price's Collision Ctr., LLC v. Progressive Hawaii Ins. Corp.</u>, 2013 WL 5782926 (M.D. Tenn. Oct. 28, 2013).

The Tennessee courts hold TCPA claims accrue when the plaintiff discovers the unlawful act or practice.  <u>Riad</u>, at *10 (<u>citing</u> <u>Fortune v. Unum Life Ins. Co.</u>, 360 S.W.3d 390, 402 (Tenn.Ct.App.2010)).  The alleged damage to Pioneer's property occurred on or about August 6, 2010.  Cincinnati paid for damages to the property caused by the water damage.  More than seven months after the water damage, on or about March 11, 2011, Pioneer formally notified Cincinnati for the first time of its intention to make a claim for loss of business income.

Cincinnati proceeded to investigate the business income claim.  This included

---

[7] Plaintiff's counsel has provided notice that it will not be pursuing this claim at trial.

investigation whether FCA had an agreement to lease the property and the Examination Under Oath that was taken on April 20, 2011. Subsequent to the EUO, Cincinnati's counsel requested additional documentation and return of the EUO errata sheet. Thereafter, Cincinnati issued its initial denial on June 9, 2011. It is the denial of Pioneer's insurance claim which forms the basis of any alleged consumer protection claim flows. Therefore, Pioneer's cause of action for alleged violations of the TCPA accrued well after the enactment of Tenn. Code Ann. §56-8-113 on April 29, 2011 and should be dismissed as a matter of law.

## CONCLUSION

Pioneer's complaint is based upon Cincinnati's denial of its Business Income claim. The claim was denied because Pioneer sustained no "actual" loss of business income resulting from water damage at its property. In spite of Pioneer's contention to the contrary, Family Christian Academy never agreed to lease the property, and there was certainly no evidence of a meeting of the minds required to support any such agreement.

Further, no evidence suggests any of the entities identified by Pioneer had anything more than an "interest" in the Pioneer property. Thus, any business income claim based upon such interest is speculative at best and fails to demonstrate an actual loss of business income. Likewise, any argument Pioneer had a business income claim based upon the right of lease payments under the agreement with Nashville Global Academy who abandoned the property fails to demonstrate an "actual" loss of business income because Pioneer was unlikely to receive such rent payments had the water loss occurred.

Based upon the undisputed facts, Pioneer has failed to demonstrate that it sustained an actual loss of Business Income as required by the policy and under Tennessee law. Accordingly, Cincinnati is entitled to summary judgment as a matter of law and a declaration that its policy provides no coverage for Pioneer's Business Income Claim. Because Pioneer's claim is not covered by the policy, Pioneer's complaint, including its claims for Bad Faith, Negligence, Unjust Enrichment, and violations of the Tennessee Consumer Protection Act, should also be dismissed as a matter of law.

Respectfully submitted,

_s/ E. Jason Ferrell_____
**PARKS T. CHASTAIN**
Registration No. 13744
**E. JASON FERRELL**
Registration No. 24425
Attorneys for Defendant Cincinnati Insurance Company

**BREWER, KRAUSE, BROOKS, CHASTAIN & BURROW, PLLC**
P. O. Box 23890
Nashville, TN 37202-3890
(615) 256-8787

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of March, 2014, a true and correct copy of the foregoing Memorandum of Law was filed electronically. Notice of this filing will be sent by operation of the court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U. S. Mail. Parties may access this file through the court's electronic filing system.

Jonathan A. Street, Esq.
Higgins, Himmelberg & Pilponis, PLLC
116 Third Avenue South
Nashville, TN   37201


 s/ E. Jason Ferrell_____
**E. JASON FERRELL**